UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN M. ERICKSON,

       Plaintiff,    Case No.: 12-cv-11354
              Honorable Nancy G. Edmunds
    v.        Magistrate Judge David R. Grand

MICHAEL ASTRUE,
Commissioner of Social Security,

       Defendant.
_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 9]**

  Plaintiff Kevin Erickson brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.  RECOMMENDATION**

  For the reasons set forth below, the court finds that the Administrative Law Judge's ("ALJ") opinion is supported by substantial evidence in the record. Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [9] be GRANTED, Erickson's motion [8] be DENIED and that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision be AFFIRMED.

II.     **REPORT**

A.      **Procedural History**

On August 12, 2008, Erickson filed an application for DIB, alleging disability as of November 17, 2007. (Tr. 97-104).[1] The claim was denied initially on September 5, 2008. (Tr. 53-57). Thereafter, Erickson filed a timely request for an administrative hearing, which was held on April 13, 2010, before ALJ Elliott Bruce. (Tr. 35-51). Erickson, represented by attorney Mikel Lupisella, testified, as did Vocational Expert ("VE") Ann Tremblay. (*Id.*). On June 23, 2010, the ALJ found Erickson not disabled. (Tr. 17-32). On March 5, 2012, the Appeals Council denied review. (Tr. 1-6). Erickson filed for judicial review of the final decision on March 26, 2012.

B.      **Background**

1.      *Disability Reports*

In an August 21, 2008 disability report, Erickson reported that the condition preventing him from working was degenerative disc disease. (Tr. 131). He reported that the condition prevents him from lifting, bending, or doing "twisting motions without pain." (*Id.*). He reported that he first stopped working as a carpenter in November 2007 and was diagnosed with a gall bladder problem in January 2008, which he believed was the source of his back troubles. (Tr. 131). However, after surgery, he attempted to return to work for two weeks but then had to quit again in March 2008 due to continued back troubles. (*Id.*). Erickson reported being treated by several doctors for his condition, and taking hydrocodone for pain, which causes him to have "w[ei]rd dreams." (Tr. 133-36). He also reported undergoing several tests including EMGs, X-

---

[1] Erickson filed an application for Supplemental Security Income benefits on the same date, alleging the same disability onset date. (Tr. 94-96). However, for reasons not apparent to the court, that application was not addressed in the ALJ's decision or in Erickson's motion, and thus it is not under consideration here.

rays and MRI/CT scans.  (Tr. 137).

In a function report dated August 31, 2008, Erickson reported that his daily activities include daily housework, such as cleaning, dishes, laundry, making beds and preparing supper. (Tr. 142).  He reported that his condition sometimes interferes with his ability to tie his shoes, but otherwise he has no trouble with self-care.  (Tr. 143).  He prepares simple meals daily that take him about half an hour.  (Tr. 144).  He also does small repairs around the house.  (*Id.*).  He is unable to perform yard work because it aggravates his back.  (Tr. 145).  However, he goes outside daily to walk and sit on the deck and he can drive alone.  (*Id.*).  His hobbies included building wood projects, bowling and basketball, but he no longer participates in sports due to his condition.  (Tr. 146).  He visits with his in-laws two to three times a week and attends his children's sporting events, although he has to alternate between sitting and standing while there. (Tr. 146-47).  Erickson reported that his condition affects his ability to lift, bend, stand and sit. (Tr. 147).  He reported he cannot lift heavy objects "on a daily basis due to bending of back," that bending over causes pain and that when standing, he must lean on something.  (*Id.*).  He also reported having a hard time standing up when sitting on hard surfaces like bleachers.  (*Id.*).  He indicated that he is able to walk a half mile before needing to stop and rest.  (*Id.*).

In an October 20, 2008 disability appeals report, Erickson reported that his condition had worsened and he now has severe back pain with radiating pain down his legs.  (Tr. 153).  He reported no new medications as a result of his condition and no new tests.  (Tr. 155).

### 2.    *Plaintiff's Testimony*

At the hearing, Erickson testified that he lives with his wife and one son in a house.  (Tr. 39-40).  He drives between four and ten miles a day transporting his son to school or work.  (Tr. 40).  Erickson testified that he experiences severe pain every day in his lower back.  (Tr. 43).  He

3

also has some pain in his upper back, as well as his knees, ankles and hands.  (*Id.*).  He testified that he has never had back surgery and was once offered a TENS unit but then was told by a physical therapist that he did not need it.  (*Id.*).  He takes Vicodin, Skelaxin, Tramadol and Naproxen for pain.  (*Id.*).

Erickson testified that he is not capable of working full time because his lower back makes it hard to get out of bed on certain mornings, and that he sometimes has trouble lifting, walking and ascending or descending stairs.  (Tr. 45).  He testified that he cannot sit, stand or walk for long periods of time.  (*Id.*).  For instance, when he sits for a long time his back tightens up.  (*Id.*).  The trip from his home to the hearing was 109 miles and he had to stop three times to move around outside the car.  (Tr. 45-46).  His wife drove part of the trip and he drove the other part.  (Tr. 46).  He often lies down during the day on his side and applies moist heat to his back, as recommended by his doctor.  (*Id.*).  On bad days, Erickson testified, he cannot "even move." (*Id.*).  He has to hold objects to walk and if he takes his medication he can no longer drive and someone else has to pick up and drop off his son.  (*Id.*).  He has three or four bad days a week, more if the weather is bad.  (Tr. 47).

### 3. *Medical Evidence*

#### a. *Treating Sources*

Erickson was treated by Delinah Anderson, a certified physician's assistant ("PAC") at his primary care office on November 21, 2007, for right flank pain.  (Tr. 238).  He reported having fallen off a ladder five weeks prior.  (*Id.*).  She diagnosed him with flank pain, with the need to rule out a fracture.  (*Id.*).  At a follow-up on November 27, 2007, Erickson reported continued flank pain secondary to his fall from a ladder.  (Tr. 236).  Upon examination, Erickson was "tender to palpation throughout the posterior ribs and around through the side."  (*Id.*).  PAC

Anderson wrote him a prescription for Flexeril for possible muscle spasms, and recommended that he return "as needed." (*Id.*).

At a follow-up on March 11, 2008, Erickson reported continued pain in his right flank that is "worse with movement." (Tr. 229). He reported that he had been doing fine "up until about a week ago when he had been doing a lot of work on the house, drilling and it seems to make the pain in his side worse." (*Id.*). Upon examination, PAC Anderson noted tenderness "to palpation along the right lower ribs and he does have pain with flexion, lateral bending and rotation." (*Id.*). She diagnosed him with chest wall pain, secondary to an old injury. (*Id.*). She continued Erickson's Vicodin and ordered an x-ray of his thoracic and lumbar spine. (*Id.*).

X-rays taken of Erickson's ribs on March 10, 2008, showed old fractures of his left 4th and 5th ribs, but otherwise "no acute findings." (Tr. 265). X-rays taken of Erickson's lumbar and thoracic spine on March 12, 2008, showed a "mild compression deformity of the L4 vertebral body," and "mild compression deformities of multiple vertebral bodies within the mid to lower thoracic spine," which appeared to be "chronic," as well as "mild degenerative changes." (Tr. 264). An MRI was recommended "if clinically indicated." (*Id.*).

A March 20, 2008 MRI of Erickson's lumbar spine found "[m]ild compression deformity of the superior endplate of L4. There is slight increased T2 signal or edema within the anterior superior endplates of L4 and L3 which may represent subacute fracture." (Tr. 200). An MRI taken the same day of Erickson's thoracic spine found "[m]ild degenerative changes," "[m]ild compression deformities at several of the mid to lower thoracic vertebral bodies which are most likely chronic . . . [and] an area of edema within the anterior inferior endplate of T9 which may represent acute injury," as well as "a small syrinx within the spinal cord at the T7-T8 level, this measures only mm in diameter." (Tr. 201). Follow-up studies were suggested. (Tr. 200-201).

5

At a March 25, 2008 follow-up with PAC Anderson, Erickson reported continued pain in his lower right ribs with activity.  (Tr. 227).  He reported that he was taking Vicodin on an "as needed basis only."  (*Id.*).  Upon examination, Erickson was "tender to palpation along the lower ribs on the right . . ."  (*Id.*).  He was not tender over the spine.  (*Id.*).  Anderson referred him to physical therapy and prescribed Robaxin and Lidoderm patches.  (*Id.*).

Erickson underwent a four-week course of physical therapy beginning on March 26, 2008.  (Tr. 165-66).  By the end of his course, on May 2, 2008, the physical therapist noted that Erickson had decreased pain, an increased range of motion, and improved tolerance for both activities of daily living and recreational activities.  (Tr. 183).

At a follow-up with PAC Anderson on May 6, 2008, Erickson reported that he actually felt worse after completing therapy, with "pain all over . . . and the pain in the right lower rib/flank area is much worse."  (Tr. 225).  Upon examination she noted tenderness to palpation "throughout the lower right ribs."  (*Id.*).  She diagnosed him with back pain, ordered an EMG of his lower extremities and referred him to a "Dr. DiBella for the pain."  (*Id.*).  At another follow-up on May 28, 2008, Erickson reported continued "severe pain, mostly in the mid back with radiation around the right side."  (Tr. 222).  Erickson reported that "[i]f he is just sitting and not doing anything he does not experience pain, but as soon as he starts to work and after he works he experiences pain."  (*Id.*).  Upon examination Anderson noted "no tenderness around the vertebra," and that "[h]is pain is not reproducible."  (*Id.*).  She diagnosed him with back pain and prescribed a repeat MRI of the thoracic and lumbar spine.  (*Id.*).

On June 7, 2008, Erickson was evaluated by Dr. Malcolm Field, a neurosurgeon.  (Tr. 193-94).  Erickson reported that he had back pain that was "aggravated somewhat by coughing and straining," and resulted in "a lot of stiffness and tightness."  (Tr. 193).  However, the pain

6

was "not particularly aggravated by maneuvers that increase intraspinal pressure," and Dr. Field

did not find "any positive findings as near as I can ascertain," as Erickson's "gait and Romberg

[tests] have always been normal." (*Id.*). Upon examination, Erickson did have positive straight

leg raising and dorsiflexion tests. (Tr. 194). However, his lumbar flexion was normal, and there

was no gluteal sagging or sciatic notch tenderness. (*Id.*). Erickson had "moderate paravertebral

muscle tightness," although his senses and nerves were "intact." (*Id.*). Dr. Field reviewed

Erickson's MRI and noted "three levels of disk degeneration with L4-L5 probably the most

advanced and that is not a great deal." (*Id.*). He recommended epidural blocks. (*Id.*).

On June 17, 2008, Erickson was evaluated for treatment by Dr. John DiBella at a pain

clinic. (Tr. 188-89). Erickson reported that he had pain in his thoracic area that radiated from

the "midline low thoracic back to the right flank" and also "toward the right upper quadrant of

the abdomen." (Tr. 188). In addition, he reported lumbosacral pain "radiating across the lumbar

back to the hips bilaterally." (*Id.*). He denied radiation, numbness, tingling or weakness in his

lower extremities. (*Id.*). Erickson classified his pain as between a 3 and a 9 on a scale of 1-10.

(*Id.*). He reported great increase in pain with "moderate levels of physical activities and

activities including bending and lifting." (*Id.*). He reported that moist heat helped, and that he

had been using prescribed analgesics and muscle relaxers "sparingly if at all." (*Id.*). He also

reported prior physical therapy and chiropractic care "with no reduction of pain levels." (*Id.*).

However, he found that "gentle activity is more beneficial than is complete relaxation." (*Id.*).

Upon examination, Dr. DiBella noted tenderness over L4, L5, T9 and T10, with a

"moderate paraspinous muscle spasm in the lower thoracic segments bilaterally, right greater

than left." (Tr. 189). He also noted moderate spasm in Erickson's lower lumbar segments, right

greater than left. (*Id.*). An examination of the motor function and senses in Erickson's lower

extremities was normal.  (*Id.*).  Dr. DiBella reviewed Erickson's prior MRI scan and diagnosed him with degenerative changes in the thoracic spine with associated radiculopathy at T9-10 and low back pain syndrome, possible radiculopathy at L4-5.  (*Id.*).  He prescribed a series of thoracic steroidal injections.  (*Id.*).  Dr. DiBella wrote a letter that same day to Dr. Field documenting his examination of Erickson.  (Tr. 186-87).

Erickson underwent a steroid injection at T9-10 on June 19, 2008.  (Tr. 205).  Erickson's pain level was 5/10 both before and after the procedure.  (*Id.*).  He underwent a second injection in the same spot on June 23, 2008.  (Tr. 206).  His pain level was 6 preceding the injection and 5 afterwards.  (*Id.*).  On July 7, 2008, Erickson received a steroid injection at T10-11.  (Tr. 207).  His pain level before the procedure was a 6-7 and was a 6 afterwards.  (*Id.*).  He received another injection at T9-10 on July 14, 2008.  (Tr. 208).  His pain level both before and after the procedure was 4/10.  (*Id.*).

Erickson saw PAC Anderson on July 9, 2008, for a recheck and paperwork.  (Tr. 219).  He reported that his back pain "feels better for awhile [sic] and then as soon as he goes back to doing anything it hurts really bad.  He tried to do some yard work at home on Saturday and the next day he was on the couch all day long."  (*Id.*).  Upon examination, PAC Anderson noted tenderness to palpation on the right side of the paraspinal muscles of the thoracic spine and over the vertebra of the thoracic and lumbar spine.  (*Id.*).  She also noted "diminished" range of motion although she did not articulate with any specificity what range of motion was diminished. (*Id.*).  She diagnosed back pain and filled out "disability papers for work stating that for now he is completely disabled from doing his job.  We will reevaluate him in 4-6 weeks"  (*Id.*).

On July 21, 2008, Dr. DiBella wrote a letter to Dr. Field documenting that Erickson had completed steroid injections for "diagnosed thoracic radiculopathy at T9-10," which had

improved his pain by 60%.  (Tr. 185).  Dr. DiBella noted that his "hope is with the final injection, [Erickson's] pain relief will be better realized within the next ten to fourteen days." (*Id.*).

Erickson followed up with Dr. Field on August 9, 2008.  (Tr. 192).  Dr. Field wrote a letter to a "Dr. Bash" where he discussed Erickson's condition.  (*Id.*).  He characterized Erickson's pain as "primarily spine pain with some aching in his legs, which limits his ability to walk any great distance."  (*Id.*).  He noted that Erickson had cervical degenerative disk disease and "is probably one who has diffuse spine disease."  (*Id.*).[2]  He then said, "Is he going to be able to go back to doing heavy physical work, I don't know that.  I would doubt that he does."  (*Id.*).  Dr. Field concluded that he believed Erickson was "neurologically intact," although he wanted a CT scan of the thoracic and lumbar spine to be sure.  (*Id.*).

An August 18, 2008 CT scan of Erickson's thoracic spine found "[o]ld minor compression deformities anteriorly at T8 and 9 with mild associated hypertrophic change anteriorly.  Otherwise, negative CT of the thoracic spine."  (Tr. 199).  A CT scan taken the same day of Erickson's lumbar spine found "[m]ild disk bulging at L3-4 and L4-5 without evidence of disk herniation," "[m]oderate lower lumbar facet osteoarthritis which does not encroach on the spinal canal [but] [n]o evidence of spinal stenosis," and "L5 has transitional characteristics on the left and participates in the sacroiliac joint with some associated hypertrophic spurring."  (*Id.*).

At an August 27, 2008 appointment with PAC Anderson, Erickson reported continued pain in his back that is aggravated with "any physical activity" and improves with rest.  (Tr. 281).  PAC Anderson performed an examination, but the examination does not appear to have

---

[2] Dr. Field states that Erickson suffered from cervical degenerative disk disease, but there is no other evidence anywhere in the record, including in the notes of Dr. Field or others in his office, of any problems with Erickson's cervical spine.  (Tr. 192).

included his back.  (*Id.*).  She diagnosed back pain and filled out "his form."  (*Id.*).

A September 4, 2008 EMG and nerve conduction study of Erickson's bilateral legs was normal.  (Tr. 160).  At a follow-up with PAC Anderson on October 1, 2008, Erickson reported that his pain was getting worse and that he could not do "anything without having severe pain, to the point where it brings tears to his eyes."  (Tr. 297).  He reported that Dr. Field planned to perform a two-level fusion.  (*Id.*).  He also reported that he takes Vicodin "when the pain gets really bad."  (*Id.*).  Upon examination, PAC Anderson noted that Erickson was "tender to palpation on the right side of the lower thoracic vertebra.  He has pain with [range of motion] of the upper extremity."  (*Id.*).  She diagnosed him with chronic back pain, filled out another form for his insurance company and prescribed Vicodin with no refills.  (*Id.*).

At a follow-up with Dr. Field on September 30, 2008, Erickson was noted to have "very significant changes at the L3-4 levels," and "pretty advanced degenerative disk disease at the L4-5 level" which the doctor opined would eventually "require operative intervention."  (Tr. 306).  There were no new symptoms on examination, although Erickson's gait was "somewhat slow" and he had "significant restriction of lumbar spine motion."  (*Id.*).

An October 17, 2008 MRI of Erickson's thoracic spine found "[o]ld minor compression deformities of T8 and T9 vertebral bodies.  Moderate spondylosis in the lower half of the thoracic spine.  No change since 8/18/08."  (Tr. 301).  An MRI of his lumbar spine taken the same day found "[d]egenerative disk disease at L4-5," and "[m]oderate low lumbar spondylosis and facet osteoarthritis."  ((Tr. 302).

On October 27, 2008, Erickson was evaluated by Dr. Waheed Akbar, an orthopedic surgeon.  (Tr. 357-58).  Erickson reported mid-thoracic and low back pain that increases "with increased activity when he is very active."  (Tr. 357).  He reported no problems in his legs, and

10

that he takes Vicodin 3-5 times a week. (*Id.*). Upon examination, Dr. Akbar noted generalized tenderness and stiffness in the lumbar and thoracic spines. (*Id.*). Dr. Akbar reviewed Erickson's x-rays and MRIs, and concluded that treatment should be symptomatic, such as exercises, nonsteroidals and limitations of activity, because he did not "see enough findings in his work up to recommend a fusion." (Tr. 358).

A December 12, 2008 MRI of Erickson's thoracic spine found a "[s]mall left paracentral disk osteophyte complex at T8-9 level without segmental spinal stenosis," "[m]inimal disk degenerative changes in the thoracic spine," and "no significant interval change in the prominent central canal/small syrinx in the thoracic spine when compared with to previous study." (Tr. 298). An MRI taken the same day of Erickson's lumbar spine found an "[a]symmetric circumferential disk bulge to the left with bilateral facet degenerative changes and ligamentum flavum thickening causing mild segmental spinal stenosis, bilateral lateral recess and bilateral neural fora[min]al narrowing, greater on the left than the right at L4-5," and a "[s]mall circumferential disk bulge, bilateral facet degenerative changes causing mild bilateral inferior neural foraminal narrowing at L3-4 level." (Tr. 300).

At a December 30, 2008 follow-up with PAC Anderson, Erickson reported that Dr. Field had recommended a fusion due to lost disk space at L5. (Tr. 316). He also reported that a Dr. Akbar believed that his condition was simply arthritis. (*Id.*). A second opinion from a Dr. Patel diagnosed a cyst in Erickson's lower lumbar spine. (*Id.*). Erickson reported that "[i]f he does anything at home, especially with the right upper extremity, he is unable to do a whole lot for 2-3 days." (*Id.*). Anderson did not perform an examination of Erickson's musculoskeletal system at this appointment, but indicated that she "did fill out a disability form for [Erickson] until January 12, 2009." (*Id.*).

11

At a January 29, 2009 follow-up with Dr. Field's office, Erickson was treated by Steven Lackie, a PAC in the office.  (Tr. 304-305).  Erickson reported continued stiffness and lumbosacral pain generated by his daily activities, but no pain in his lower extremities.  (Tr. 304).  Upon examination, PAC Lackie noted "a lot of pain with flexion and extension," and "some pain on the left side in the lumbosacral area only with lumbosacral maneuvering and palpation, but no evidence of any type of radiculopathy with straight-leg raise nor with flexion and extension."  (*Id.*).  PAC Lackie concluded that there was "nothing specifically on the examination that would make me think that he had a neurogenic problem of any type."  (*Id.*).  PAC Lackie opined that Erickson's pain "may be consistent with a small disk collapse at [L5]," and that facet blocks might be helpful.  (Tr. 305).

On February 12, 2009, Erickson began treatment with Patricia Frick, a nurse practitioner ("NP") working with Dr. Michael Papenfuse of the Matrix Pain Clinic.  (Tr. 341-45).  Erickson reported constant low back pain that did not radiate.  He reported difficulty standing for long periods or sitting on bleachers "any longer than half an hour," and that he leans on a cart at the store and constantly shifts position.  (Tr. 341).  He reported no success with physical therapy, with chiropractic care, or with steroidal injections, but noted that those had focused on his upper back. (*Id.*).  He reported taking Vicodin 2-3 times a week, which helped with the pain, and that his pain was currently an 8/10.  (*Id.*).  At its worst it was a 10 and at its best it was a 5.  (*Id.*).  Upon examination, Frick noted that Erickson's gait was steady and a Romberg test was negative.  (Tr. 342).  Erickson was able to stand on his heels and toes "without difficulty."  (*Id.*).  There was midline tenderness at L5-S1 and tenderness over the right facet at L5-S1 and over the left at L3-S1.  (Tr. 343).  Straight leg raising test was negative to 40 degrees bilaterally, but a range of motion test was limited in all movement.  (*Id.*).  Erickson exhibited the most discomfort with

right and left lateral rotation and extension, and the least discomfort with flexion at 70 degrees. (*Id.*). His lower extremity exam was normal except for complaint of "some slight decrease in sensation in the anterior calf" bilaterally. (*Id.*). His upper extremity examination was normal. (*Id.*). Frick reviewed Erickson's MRI and EMG and diagnosed him with "[c]hronic low back pain secondary to multilevel degenerative disk disease, degenerative joint disease, disk bulge L3-L4 and L4-L5 with associated mild segmental spinal stenosis L4-L5 and bilateral lumbar facet syndrome." (Tr. 344). Frick scheduled bilateral lumbar facet injections. (*Id.*). She also ordered blood work and physical therapy. (*Id.*). Erickson received a lumbar facet block injection on February 24, 2009, and interlaminar lumbar epidural steroid blocks on March 11, 2009, and March 25, 2009. (Tr. 326-31). Erickson reported no gain in pain relief from his first block, but a 30% gain from his second block. (Tr. 326; 328).

On April 1, 2009, Erickson had a follow-up with PAC Anderson. (Tr. 315). He reported seeing Dr. Papenfuse who had given him an injection that made him feel "somewhat better" but then he got "progressively worse." (*Id.*). He reported that when he went back for a second injection the doctor told him that "he was probably feeling better, but he was doing too much activity," and they placed him on "limited activity." (*Id.*). Upon examination, Anderson noted "flexion at the lumbar spine of about 40 degrees," and that Erickson was "tender to palpation across the lumbar spine." (*Id.*). She diagnosed him with chronic lower back pain, degenerative disk disease and degenerative joint disease. (*Id.*). She wrote him another note "for continued complete disability from work through the end of May." (*Id.*).

At an appointment on April 22, 2009, with NP Frick, Erickson continued to report back pain with "increased pressure sensation" and "burning sensation more intermittent in the left thighs and lateral calves." (Tr. 339). His pain was 8 out of 10. (*Id.*). He felt most comfortable

13

standing and walking, while sitting and lying down were most uncomfortable. (*Id.*). He reported some improvement after his last injection, but that at the beginning of the current week "he could hardly sit back in a chair." (*Id.*). He also reported doing pain free exercises once a day. (Tr. 340). Upon examination, Erickson was noted to be tender at L3-L4 and L4-L5, as well as over the right SI joint. (*Id.*). A straight leg raising test elicited discomfort at approximately 80 degrees and his gait was steady. (*Id.*). Frick concluded that no additional steroid injections could be done at this time and, due to the fact that Erickson had a disk bulge at two levels, she discussed the possibility of a discogram. (*Id.*). She also ordered blood work and physical therapy. (*Id.*).

On May 21, 2009, Erickson underwent an L2-L3, L3-L4, L4-L5 and L5-S1 discogram and discography by Dr. Papenfuse. (Tr. 323-25). At a June 1, 2009 follow-up appointment, Dr. Papenfuse noted that "[a]ll four discs proved to be negative for any discogenic pain." (Tr. 337). Erickson continued to report pain that was 8/10 on a pain scale, which was worse with sitting and bending, but better with walking. (*Id.*). Upon examination, it was noted that Erickson was sitting comfortably on the exam table and there was no significant paraspinal spasm. (*Id.*). The results of the discogram showed significant degenerative disk disease at L3-L4 and L4-L5. (*Id.*). The post discogram CT results showed generalized disk disease at those points but "no disk herniations or other significant problems." (*Id.*). Dr. Papenfuse provided Erickson with exercises to perform, and prescribed a course of physical therapy and a TENS unit. (Tr. 337-38). He also wrote a prescription for Ultracet. (Tr. 338). A follow-up CT scan performed on May 22, 2009, found "[g]eneralized disc degeneration [ ] present at L3-4 and L4-5. There is localized annular disruption posterolaterally on the left at L5-S1." (Tr. 346).

At a July 15, 2009 follow-up with NP Frick, Erickson reported sharp low back pain that

14

flared up when he attempted to move picnic tables for an open house. (Tr. 335). "He complains of more pain the first thing in the morning if he has to do any lifting and physical labor over the weekend." (*Id.*). Erickson reported being most comfortable walking, but that sitting was also helpful. (*Id.*). He felt that physical therapy was helping and reported that he was not taking the Ultracet with any frequency. (*Id.*). Upon examination, Frick noted midline tenderness and facet tenderness at L5-S1. (Tr. 336). A straight-leg raising test was negative and his gait was steady. (*Id.*). NP Frick continued his medication and his physical therapy. (*Id.*).

At a follow-up with PAC Anderson on July 29, 2009, Erickson reported that when he was "going through therapy he felt excellent," but that "[o]nce he started doing things at home the back pain started and it really limits his ability to do anything." (Tr. 314). Upon examination, Anderson noted a decreased range of motion in Erickson's lumbar spine, as well as tenderness to palpation in that area. (*Id.*). She filled out a disability form for him "through October 1st." (*Id.*). At another follow-up on September 30, 2009, Erickson reported that he went through a course of pain management and physical therapy but still had pain in his lower back radiating into his legs. (Tr. 313). He requested a complete disability form. (*Id.*). Upon examination, Anderson noted decreased range of motion with extension. (*Id.*). She diagnosed him with chronic back pain and referred him to Dr. Field. (*Id.*).

On August 18, 2009, Erickson followed up with NP Frick at Dr. Field's office. (Tr. 332-34). He complained of aching, burning low back pain that "he notices [ ] if he does certain activities such as cutting firewood, bending, and lifting." (Tr. 332). It goes away if he "takes it easy and lies down." (*Id.*). He did not refill his Ultracet prescription. (*Id.*). He also reported finding lying on his stomach with his elbows propped up to be the most beneficial position. (*Id.*). Upon examination, Erickson was tender at L4-L5 and over the SI joints bilaterally. (Tr.

333).   A straight leg raising test was negative, and his gait was steady.   (*Id.*).   NP Frick recommended continuing conservative treatment, and advised Erickson to continue physical therapy and return as needed.  (Tr. 333).

At an October 20, 2009 follow-up appointment with Dr. Field, the doctor noted that Erickson "has some degenerative changes in his spine but they are not very far advanced and yet he has diffuse joint pain which makes me wonder about whether he has some type of inflammatory arthritis."  (Tr. 303).  He recommended tests to determine whether Erickson suffered from such a disorder.  (*Id.*).  Because of this, Dr. Field concluded that "I do not think that the mild disc degeneration that he has is responsible for all of these symptoms and I do not think a spine operation is going to significantly help this."  (*Id.*).

At a November 25, 2009 follow-up with PAC Anderson, Erickson reported continued pain that, on some days, "has been quite debilitating."  (Tr. 312).  He reported that he had seen Dr. Field in October, and had gotten blood work done, but "has never gone back to get the results of that."  (*Id.*).  He reported taking Naproxen twice a day and "pain pills as needed."  (*Id.*).  Anderson did not perform a musculoskeletal examination of Erickson, but diagnosed him with "[b]ack pain with elevated sedimentation rate and CRP."  (*Id.*).  At a follow-up on December 9, 2009, Erickson reported chronic pain in his back, as well as in his ankles, knees, elbows, and shoulders.  (Tr. 311).  Other parts of these treatment notes are illegible, but it appears PAC Anderson referred Erickson to a rheumatologist.  (*Id.*).  A note at the bottom of the page reads that a person at Dr. Field's office stated that Dr. Field could not determine why Erickson's "labs are up," and that he could not "help him."  (*Id.*).

Erickson followed up with Dr. Field on December 15, 2009.  (Tr. 360).  Dr. Field noted a severely elevated CRP result, and that arrangements had been made for him to see a

rheumatologist.  (*Id.*).  He advised that an operation for "minor disk disease" would be "the wrong thing to do."  (*Id.*).

On February 3, 2010, Erickson had another follow-up with PAC Anderson.  (Tr. 310).  He reported being seen by a "Dr. Maciulis," who diagnosed him with osteoarthritis and prescribed him a back brace, knee, ankle, and wrist braces, and forearm support bands.  (*Id.*).  He was also taking Skelaxin, Naprosyn and Tramadol.  (*Id.*).  Upon examination, Anderson noted continued "limited [range of motion] of the spine."  (*Id.*).  She diagnosed him with degenerative disk disease and osteoarthritis and filled out a form.  (*Id.*).  At a follow-up on March 3, 2010, Erickson reported an "extreme flare-up of his back pain" for the past week, and that his medications were not helping.  (Tr. 309).  He was also having a hard time with his braces.  (*Id.*).  Anderson noted continued decreased range of motion and prescribed Vicodin.  (*Id.*).

On March 11, 2010, Erickson was seen by Dr. Maciulis for a nosebleed, but the doctor also noted that Erickson complained of constant low back pain, affecting his activities of daily living.  (Tr. 364).  While the notes are generally illegible, it appears that Dr. Maciulis noted two areas of tenderness between L2 and S2 upon examination, and diagnosed Erickson with recalcitrant low back pain secondary to facet joint/intervertebral disk disease.  (*Id.*).

On March 17, 2010, PAC Anderson filled out a medical source statement for Erickson, where she found him capable of occasionally/frequently lifting less than ten pounds, standing and/or walking less than two hours in an eight-hour day, with the need to alternate between sitting and standing, and that he was limited in his ability to push or pull.  (Tr. 362).  She noted that he was "limited in most activities due to severe mid/low back pain [and] also pain in [bilateral] hands, knees [and] ankles" since "11/2007."  (*Id.*).  She opined that his condition would disrupt a regular job schedule between 100-160 hours out of a 160-hour month.  (*Id.*).

17

On March 31, 2010, Dr. Maciulis filled out a medical source statement for Erickson, noting at the top of it that his recommendations were "as answered by patient during interview!" (Tr. 366). He found that, based on those responses, Erickson could lift less than 10 pounds either frequently or occasionally, could stand or walk less than two hours of an eight-hour day, must alternate between sitting and standing, and had moderate limitations in his ability to push or pull. (*Id.*). He noted that Erickson complained of "generalized musculoskeletal pain that waxes and wanes depending upon activity" and that his limitations would "disrupt bulk of regular job." (*Id.*).[3]

### b.    Consultative and Non-Examining Sources

On September 5, 2008, a disability examiner rendered a residual functional capacity ("RFC") assessment for Erickson. (Tr. 287-93). Based on her review of the medical records to date, she found Erickson capable of lifting 20 pounds occasionally and 10 pounds frequently, standing or walking about six hours of an eight-hour work day and sitting for the same amount, and unlimited in his ability to push or pull. (Tr. 287). She also found that Erickson could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl, and frequently balance, but never climb ladders, ropes or scaffolds. (Tr. 288). He should also avoid hazards such as moving machinery and heights, but otherwise had no environmental limitations. (Tr. 290).

### 4.    Vocational Expert's Testimony

VE Ann Tremblay testified at the hearing that Erickson's past work as a carpenter was classified as skilled and heavy work. (Tr. 48). The ALJ asked the VE

---

[3] Erickson's file contains an additional treatment record from rheumatologist Dr. Carlos Diola from an August 5, 2010 appointment. (Tr. 368-69). However, that record was clearly not before the ALJ, whose decision was issued about six weeks prior. (Tr. 17-32). Rather, Erickson submitted it to the Appeals Council on appeal. (Tr. 367). However, he has not argued for a remand back to the ALJ for review of that evidence under Sentence 6 of the Act, and thus, the court will not consider the evidence in its review of the record. 42 U.S.C. § 405(g).

> to consider an individual of the claimant's age, education, and work
> history, [who] was able to perform work at the sedentary [level] that
> requires no climbing, balancing, kneeling, crouching, or crawling or more
> than occasional stooping and that allows the worker to alternate sitting and
> standing at will.

(*Id.*).  The ALJ asked if there were unskilled, entry-level occupations that such a person could

perform.  (*Id.*).  The VE testified that such a person could perform the jobs of machine operator

(2,000 jobs regionally), packager (2,200 jobs regionally), or information clerk (25,000 jobs

regionally).  (Tr. 49).  The VE testified that such jobs permit one absence a month maximum,

and three breaks a day, including a lunch break.  (*Id.*).  The VE testified that there was no

conflict between her testimony and the information contained in the Dictionary of Occupational

Titles.  (*Id.*).  Erickson's counsel asked no questions of the VE.  (*Id.*).

### C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See*

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant

part as the

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the

application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity,
> benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of
> impairments that "significantly limits . . . physical or mental ability to do basic
> work activities," benefits are denied without further analysis.

19

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueunieman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

Following the five-step sequential analysis, the ALJ found Erickson not disabled.  At Step One he determined that Erickson had not engaged in substantial gainful employment since his alleged onset date.  (Tr. 22).  At Step Two the ALJ found that Erickson had the following severe impairments:  "degenerative disc and joint disease."  (Tr. 23).  At Step Three he determined that Erickson's severe impairments, either alone or in combination, did not meet or medically equal a listed impairment, specifically considering the listings in Section 1.00 "Musculoskeletal System."  (*Id.*).  The ALJ then assessed Erickson's RFC, finding him capable of "work that does not require: exertion above the sedentary level . . . ; or any climbing, balancing, kneeling, crouching, or crawling; or more than occasional stooping; and that allows the alternating of sitting and standing at will."  (*Id.*).  At Step Four the ALJ found that, based on

Erickson's RFC, he was unable to return to his prior work.  (Tr. 26).  However, at Step Five, the ALJ concluded that, based on Erickson's age, education, vocational experience and RFC, as well as VE testimony, there existed a significant number of jobs in the national economy that he still could perform, and thus he was not disabled under the Act.  (Tr. 27).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court

is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.     Analysis

Erickson's six-page brief is mainly a compilation of block quotes of black letter case law with little to no accompanying analysis or application to the facts of his case.  He fails to specify any actual error by the ALJ, and merely cites to particular evidence which he apparently believes shows he was disabled.  Generally, "[a] court is under no obligation to scour the record for errors not identified by a claimant" and "arguments not raised and supported in more than a perfunctory manner may be deemed waived." *Martinez v. Comm'r of Soc. Sec.* No. 09-13700, 2011 U.S. Dist. LEXIS 34436 at *7 (E.D. Mich. Mar. 2, 2011) *adopted by* 2011 U.S. Dist. LEXIS 34421 (E.D. Mich. Mar. 30, 2011) (internal citations omitted).  Nevertheless, for the sake of completeness, the court will address Erickson's under-developed arguments.

22

1.    *ALJ's Hypothetical*

After first stating the black letter proposition that "for a response to a hypothetical question to constitute substantial evidence, each element of a hypothetical must accurately describe the Claimant," [8 at 7] (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994)), Erickson simply concludes that "each element of the [ALJ's] hypothetical does not accurately describe [him] in all significant, relevant respects."   [*Id.*].   However, Erickson fails to identify any specific limitation(s) that the ALJ did not incorporate into his hypothetical.   He also fails to point to any evidence in the record to support additional limitations beyond those the ALJ found credible.   While these failings would be grounds for rejecting Erickson's argument, *Martinez*, 2011 U.S. Dist. LEXIS 34436 at *7, the court also finds Erickson's argument substantively lacking in merit.

A review of the ALJ's decision, and of the record as a whole, support the limitations set forth in the ALJ's RFC assessment and in the VE hypothetical.   The ALJ noted Erickson's limiting conditions (Tr. 24), but then examined the medical records, and showed how the limitations he imposed in the RFC took those limiting conditions into account.   For instance, the ALJ noted that he accounted for Dr. DiBella's "suggest[ion] that moderate levels of physical activity would greatly increase [Erickson's] pain level..[by limiting Erickson] to no more than sedentary exertion which involves never lifting more than 10 pounds and only occasionally involving standing or walking."   (Tr. 24).   He also noted that Dr. Field's "suggest[ion] that [Erickson] would probably not be able to return to *heavy physical work*…does not preclude him from the significantly limited range of exertion required at the sedentary level."   (*Id.*) (emphasis added).   Similarly, while the ALJ accepted that Erickson's pain seemed to be the worst after he engaged in "exertionally demanding activity" such as performing yard work, cutting firewood,

and moving picnic tables and chairs (Tr. 25-26), he wrote that "I cannot find his repeated attempts to engage in activities which so exceed the sedentary RFC adopted here indicative of a severity or frequency of pain which would preclude regular and continuous work at the sedentary exertional level." (*Id.*). Finally, the ALJ noted that Dr. Field found Erickson to be "neurologically intact," and "stated that operating on [Erickson] for 'minor disk disease' was the 'wrong thing to do.'" (*Id.*). The ALJ noted that Erickson's follow-up examinations after December 2009 "have remained relatively routine." (*Id.*). Taken together, the ALJ's RFC and resulting VE hypothetical are supported by substantial evidence.[4]

### 2. *Treating Physician Rule*

Erickson's other "argument" appears to be that the ALJ failed to give appropriate weight to a treating physician's opinion. In support, he cites the medical source statement of PAC Anderson, which rendered Erickson essentially disabled from work due to his condition (Tr. 362), a medical source statement of Dr. Maciulus which indicated that it reflected only Erickson's subjective reports "as answered by [him] during interview!" (Tr. 366), and the treatment notes of Dr. Diola, which were never considered by the ALJ because they were first submitted to the Appeals Council. (Tr. 367-69).

For the reasons noted above, the notes of Dr. Diola will not be considered by this court. *See* n. 2 *supra*. The ALJ did not err in his consideration of PAC Anderson's medical source statement. As the ALJ noted, as a physician's assistant, PAC "Anderson is not an acceptable medical source," and her opinion is therefore not entitled to the same weight given to treating physicians. (Tr. 26). 20 C.F.R. §§404.1513(a) ("only 'acceptable medical sources' can give us medical opinions" and "only 'acceptable medical sources' can be considered treating sources as

---

[4] The court also notes that Erickson's counsel did not ask any questions of the VE, let alone any that incorporated limitations not imposed by the ALJ. (Tr. 49).

defined in 20 CFR 404.1502 and 416.902, whose opinions may be entitled to controlling weight.") (internal citations omitted).  Furthermore, the ALJ fully considered her opinion, finding that "her checked-off form would not seem necessarily inconsistent with an ability to perform a limited range of sedentary exertion."  (Tr. 26).  However, he found unsupported her statement that these limitations would interfere with Erickson's ability to work between 100-160 hours out of 160-hour month, as it was inconsistent with his reported and experienced activities of daily living, which far exceeded sedentary work, such as moving picnic tables and cutting firewood.  (*Id.*).  The ALJ's consideration of Anderson's statement was reasonable.

Finally, the ALJ properly dismissed Dr. Maciulis's medical source statement not only because it was unclear whether a treating relationship existed between Dr. Maciulis and Erickson, but because Dr. Maciulis made clear that the form reflects only Erickson's subjective statements, and not any objective medical findings by the doctor.  (Tr. 366); *supra* at 18.

For these reasons, the court finds that the ALJ's decision properly applied the treating physician rule and, as a whole, is supported by substantial evidence of record.

## III.   CONCLUSION

For the foregoing reasons, the court RECOMMENDS that Erickson's Motion for Summary Judgment [8] be DENIED, the Commissioner's Motion [9] be GRANTED and this case be AFFIRMED.

Dated: November 20, 2012                          s/David R. Grand
Ann Arbor, Michigan                               DAVID R. GRAND
                                                  United States Magistrate Judge


## NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as

provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).   Failure to file specific

objections constitutes a waiver of any further right of appeal.   *Thomas v. Arn*, 474 U.S. 140

(1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*,

638 F.2d 947, 949–50 (6th Cir.1981).   The filing of objections which raise some issues, but fail

to raise others with specificity, will not preserve all the objections a party might have to this

Report and Recommendation.   *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991);

*Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987).   Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 20, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager